UNITED STATES OF AMERICA,

    Plaintiff,

        v.

TDC MANAGEMENT CORP. & T.
CONRAD MONTS,

    Defendants,

    and

WASHINGTON DEVELOPMENT
    GROUP – A.R.D., INC.,

    Garnishee/Intervening Party.

Civil Action No. 89-1533 (JDB)

## MEMORANDUM OPINION

This case involves the United States' effort to collect a sixteen-year-old unpaid judgment from local real estate developer T. Conrad Monts under the Federal Debt Collection Procedures Act ("FDCPA"). In 2001, the United States obtained a nearly $1.3 million judgment against Monts and his corporation, TDC Management Corp. ("TDC"), for violations of the False Claims Act ("FCA"). Shortly after the judgment was affirmed, TDC ceased operations and dissolved. Then in 2008, in an effort to collect the judgment, the United States sought and obtained a writ of garnishment against a separate judgment (in an unrelated case) owed to the Washington Development Group – A.R.D., Inc. ("WDG"), a corporation Monts and his wife owned as tenants by the entireties. WDG intervened in this action to claim the funds, which are now held in escrow, and to object to the writ of garnishment. No other person or entity made a valid objection. Monts died in December 2009, and WDG dissolved in December 2012. Thereafter, the United States

moved for a disposition order, which this Court granted in January 2015, based on its finding that Monts's status as a principal shareholder and director of WDG gave him a substantial property interest in the funds owed to WDG to support garnishment. On appeal, the D.C. Circuit held that Monts did not have a substantial interest, and remanded the case for consideration of "the Government's alternative argument that it may garnish WDG's assets by piercing the corporate veil between WDG and Monts." United States v. TDC Mgmt. Corp., Inc., 827 F.3d 1127, 1129 (D.C. Cir. 2016). Following remand, WDG moved for a disposition order and the government filed an opposition, requesting that the Court grant disposition in favor of the United States based on the veil-piercing theory.

Upon careful consideration of the parties' competing motions and memoranda,[1] the applicable law, and the record, and for the reasons explained below, the Court will deny WDG's motion for a disposition order, grant the government's motion, and direct the garnishee to pay the United States.

## BACKGROUND

On March 29, 2000, the Court, through another judge of this District, granted summary judgment on the merits of this case in favor of the United States, finding that Monts and TDC violated the FCA. Mar. 29, 2000 Mem. Op. & Order [ECF Nos. 148, 149]. The Court awarded the United States $1.285 million in damages and civil penalties and found Monts and TDC jointly and severally liable for this award. Feb. 6, 2001 Mem. Op. & Order [ECF Nos. 164, 165]; Apr. 10, 2001 Order [ECF No. 171]. The D.C. Circuit affirmed the judgment. United States v. TDC

---

[1] Gov't's 2d Mot. for Disposition Order [ECF No. 259] ("Gov't's 2d Mot. for Order"); Interv'r's Opp'n to Gov't's 2d Mot. for Order [ECF No. 261] ("Interv'r's 2d Opp'n"); Gov't's Reply to Interv'r's 2d Opp'n [ECF No. 265] ("Gov't's 2d Reply"); Gov't's 3d Mot. for Disposition Order [ECF No. 276] ("Gov't's 3d Mot. for Order"); Opp'n to Gov't's 3d Mot. for Order [ECF No. 278] ("Interv'r's 3d Opp'n"); Gov't's Reply to Interv'r's 3d Opp'n [ECF No. 279] ("Gov't's 3d Reply"); Interv'r's Mot. for Disposition Order [ECF No. 297-1] ("Interv'r's Mot. for Order"); Gov't's Opp'n to Interv'r's Mot. for Order [ECF No. 298]; Interv'r's Reply to Gov't's Opp'n [ECF No. 300].

Mgmt. Corp., Inc., 288 F.3d 421 (D.C. Cir. 2002). Shortly thereafter, "TDC ceased active operations and dissolved." Defs.' & Interv'r's' Resp. to Gov't's Objections to Magistrate's R&R [ECF No. 285] at 1.

In an effort to collect the judgment in this case, the United States targeted an $8.4 million judgment obtained by WDG, another corporation wholly owned by T. Conrad Monts and his wife Barbara Monts, as tenants by the entireties, and for which Monts served as president and a director. Gov't's 2d Mot. for Order at 4; Interv'r's 2d Opp'n at 4; Ex. 1 to Gov't's 2d Mot. for Order [ECF No. 259-1] ("Hersh Decl.") at 1, 4; Ex. B to Interv'r's 2d Opp'n [ECF No. 261–2] ("Rogers Decl.") ¶ 43. In 2004, a jury in the D.C. Superior Court awarded WDG the $8.4 million judgment against the District of Columbia ("the District") in a lawsuit concerning an air-rights lease. Upon the government's application in July 2008, this Court issued a writ of garnishment against the judgment funds owed to WDG. See Gov't's Mots. for Writ of Garnishment [ECF Nos. 187, 188]; Jul. 8, 2008 Docket Notation. The government served the writ on the garnishees, the District and WDG. See Affs. of Service [ECF Nos. 218-3, 218-4].

The District was the only party to file a timely response. See Jul. 23, 2008 District's Answer to Writ of Garnishment [ECF No. 189]. The District argued that the Superior Court judgment did not direct it to pay money to TDC or Monts, but to WDG, an entity "owned and controlled by Monts"; that both the District and WDG were appealing the judgment; and that at the same time the District and WDG were attempting to negotiate a settlement. Sept. 3, 2008 District's Resp. [ECF No. 191] at 1–2. Neither Monts nor TDC filed a timely objection to the writ or requested a hearing. Monts subsequently died in 2009. See Notice of Death of Def. T. Conrad Monts [ECF No. 203]. To date, no party has been properly substituted for Monts.

In February 2012, the government moved for a disposition order pursuant to 28 U.S.C. § 3205(c)(7), directing the District to pay, from the judgment funds owed to WDG, an amount equal to the judgment against Monts and TDC in this action. See Gov't's 1st Mot. for Order [ECF No. 204]. Then, in March 2012—more than three-and-a-half years after the writ was issued—WDG moved to intervene in this action, arguing that the government could not garnish funds owned by a non-party. See Mot. to Intervene by WDG [ECF No. 211]; Interv'r's 1st Opp'n [ECF No. 210]. The Court permitted WDG to intervene to challenge the garnishment on its own behalf. See July 30, 2012 Mem. Op. & Order [ECF No. 235] at 8–11. The Court denied without prejudice the government's motion for a disposition order. Id. at 1, 7.

In December 2012, the District and WDG settled all claims in the air-rights litigation, their cross-appeals were dismissed, and the District paid the $8.4 million judgment to WDG, less $2.1 million which the District held in escrow pending resolution of this action. See District's Status Report [ECF No. 238]. Within days of the settlement, WDG dissolved. See Gov't's Objection to Magistrate's R&R [ECF No. 284] at 3; Defs.' & Interv'r's' Resp. to Gov't's Objection to R&R at 4. The net assets remaining in WDG, including the judgment paid by the District (less the funds held in escrow), were distributed to Barbara Monts, who was the sole shareholder of WDG after her husband's death. Gov't's 2d Mot. for Order at 5; Hersh Decl. at 2. WDG remained a party to this action pursuant to D.C. Code § 29–312.05(a), which provides that "[a] dissolved corporation continues its corporate existence . . . to wind up and liquidate its business and affairs."

Following referral of this case to a magistrate judge, the government sought discovery from Monts, TDC, and WDG on its veil-piercing theory, "which included, among other documents, tax returns and balance sheets and . . . corporate records." Defs.' & Interv'r's' Resp. to Gov't's Objections to R&R at 2. The government then filed another motion for a disposition order,

directing the District to pay the United States the judgment in this case from the funds held in escrow. See Gov't's 3d Mot. for Order; Interv'r's 3d Opp'n. The government argued that the funds could be garnished because (1) Monts had a sufficient property interest in the funds as a shareholder and director of WDG, or alternatively, that (2) WDG was Monts's alter ego and the Court should disregard the corporate form and treat WDG's assets as Monts's. In January 2015, this Court granted the government's motion based on the first argument, and therefore did not "reach the question of veil-piercing." See Jan. 5, 2015 Mem. Op. [ECF No. 289] at 14.

WDG appealed and the D.C. Circuit concluded that Monts did not have a substantial property interest in the settlement funds under the FDCPA. TDC Mgmt. Corp., 827 F.3d at 1132. The D.C. Circuit remanded the case for this Court to "evaluate the Government's alternative argument that it may garnish WDG's assets by piercing the corporate veil between WDG and Monts." Id. at 1129. The D.C. Circuit further "commend[ed] to the district court's consideration, if necessary, the doctrine of third-party standing and 28 U.S.C. §§ 3205(a) and 3010(a), which refer to state law on co-owned property." Id. at 1134.

Following remand, WDG moved for a disposition order, asking the Court to direct the District to pay the escrow funds to WDG.[2] See Interv'r's Mot. for Order at 2. The government filed an opposition and renewed its request that the Court grant its disposition order. See Gov't's Opp'n to Interv'r's Mot. for Order at 15. This brings us to the present point, where the Court must decide whether the government can garnish the funds by piercing WDG's corporate veil.

---

[2] This motion was purportedly filed on behalf of TDC and Monts, in addition to WDG. But as explained in this Court's prior opinion, neither TDC nor Monts objected within the statutorily mandated timeframe; thus, both have forfeited any arguments. See Jan. 5, 2015 Mem. Op. at 4 n.3. Moreover, Monts is deceased and TDC is defunct, and no party has been properly substituted to represent their interests. Id.; see also id. at 6 n.4.

## LEGAL STANDARDS

The FDCPA, 28 U.S.C. § 3001 et seq., covers the collection of debts owed to the United States. Section 3205 sets forth the procedure by which the government may obtain post-judgment garnishment against a debtor's property. Id. § 3205(a)–(c). It authorizes the United States to garnish property "in which the debtor has a substantial nonexempt[3] interest and which is in the possession, custody, or control of a person other than the debtor, in order to satisfy the judgment against the debtor." Id. § 3205(a). Property is broadly described as

> any present or future interest, whether legal or equitable, in real, personal (including choses in action), or mixed property, tangible or intangible, vested or contingent, wherever located and however held (including community property and property held in trust (including spendthrift and pension trusts))[.]

Id. § 3002(12). To validly garnish property, the government must apply for a writ of garnishment against a judgment debtor's property. Id. § 3205(b). If a court determines that the requirements for such a writ are met, "the court shall issue an appropriate writ of garnishment." Id. § 3205(c)(1). The government must "serve the garnishee and the judgment debtor with a copy of the writ of garnishment[.]" Id. § 3205(c)(3). The garnishee must answer the writ within ten days of service. Id. § 3205(c)(2)(E). The judgment debtor or the United States may file a written objection to the answer and request a hearing within twenty days. Id. § 3205(c)(5). The objecting party—here, the United States—must "state the grounds for the objection and bear the burden of proving such grounds." Id.[4] After a garnishee files an answer and if no hearing is requested within the required

---

[3] A judgment debtor can elect to have certain property exempted. See 28 U.S.C. § 3014. No election has been made in this case. The government argues that a party seeking to protect co-owned property pursuant to 28 U.S.C. §§ 3205(a) and 3010 is required to exempt that property under § 3014. See Gov't's Opp'n to Interv'r's Mot. for Order at 6–7. The Court finds that the government has not adequately supported this argument.

[4] The United States filed an objection to the District's Answer, asserting that the funds held by the District are subject to garnishment because WDG "is the alter ego of Mr. Monts." See Gov't's Objection to District of Columbia's Answer to Writ of Garnishment [ECF No. 190] at 2. The United States therefore bears the burden of proving that it may garnish the funds under the alter ego theory.

time period, the Court "shall promptly enter an order directing the garnishee as to the disposition of the judgment debtor's nonexempt interest in such property." Id. § 3205(c)(7).

## ANALYSIS

### I.     D.C. LAW GOVERNING TENANCY BY THE ENTIRETIES

WDG first argues that District of Columbia law governing tenancy by the entireties bars the government from garnishing the settlement funds owed to WDG to satisfy the judgment debt owed by T. Conrad Monts in this case. Interv'r's Mot. for Disposition Order at 5–8.

The FDCPA itself creates no property rights, it merely attaches property rights created under state law. TDC Mgmt. Corp., 827 F.3d at 1131; Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., 609 F.3d 111, 117 (2d Cir. 2010). Under the FDCPA, "[c]o-owned property shall be subject to garnishment to the same extent as co-owned property under the law of the State in which such property is located." 28 U.S.C. § 3205(a); see also id. § 3010(a). In the District of Columbia, "property subject to a tenancy by the entireties . . . is unreachable by creditors of one but not of both of the tenants." Morrison v. Potter, 764 A.2d 234, 236–37 (D.C. 2000). WDG contends that "[t]ogether, the FDCPA and Morrison compel the conclusion that the government cannot garnish" the settlement funds. Interv'r's Mot. for Order at 7; see also Interv'r's Reply to Gov't's Opp'n (arguing that the fact that T. Conrad and Barbara Monts owned WDG as tenants by the entireties is "dispositive").

But WDG's argument rests on the flawed assumption that the settlement funds owed to WDG are property of the Montses—they are not. The D.C. Circuit found that the settlement funds are corporate assets belonging to WDG and D.C. law vests ownership of corporate assets in the corporation, not its shareholders.[5] TDC Mgmt. Corp., 827 F.3d at 1131 ("D.C. law is thus in

---

[5] And to the extent that WDG's argument rests on the assumption that the government is attempting to garnish "Mrs. Monts['s] . . . shares in WDG," that too is wrong. See Interv'r's Mot. for Order at 7; see also Interv'r's Reply

accord with the fundamental principle of corporate law that [t]he owner of the shares of stock in a company is not the owner of the corporation's property." (alteration in original and internal quotation marks omitted)).  Since "no claim has ever been raised . . . that WDG co-owns the property with any other entity that creates a protected joint tenancy," Gov't's Opp'n to Interv'r's Mot. for Order at 8, WDG cannot invoke D.C. law on tenancy by the entireties to shield its own corporate assets.[6]

The D.C. Circuit held that T. Conrad Monts did not have a sufficient property interest in WDG's <u>corporate assets</u> to support garnishment, and hence the Court next analyzes whether the government may garnish those assets by piercing the corporate veil.  Thereafter, after concluding that the record supports the government's veil-piercing theory, the Court will address the separate question whether WDG may assert Barbara Monts's right as a tenant by the entireties to shield the settlement funds from garnishment.

## II.     PIERCING THE CORPORATE VEIL

The government argues that WDG is Monts's alter ego, and thus, through reverse veil-piercing, the funds owed to WDG should be subject to garnishment and directed toward the satisfaction of Monts's (and TDC's) judgment debt.  The D.C. Circuit has directed this Court to evaluate that issue.

---

to Gov't's Opp'n ("If they lived in a state where creditors of only one co-tenant could reach those shares . . . ."). Rather, the D.C. Circuit recognized that "[t]he writ of garnishment at issue here, however, was issued against the settlement funds themselves, not against Monts's shares." <u>TDC Mgmt. Corp.</u>, 827 F.3d at 1131.

[6] The government also argues that WDG did not provide "timely notice of the particular grounds claiming tenancy by the entirety as an applicable exemption to garnishment" because WDG did not file an answer to the writ, failed to raise this argument in its motion to intervene, and only raised this argument for the first time to the D.C. Circuit.  Gov't's Opp'n to Interv'r's Mot. for Order at 7 n.4, 11–12.  This, the government argues, "is tantamount to a waiver" and means that WDG has failed to carry its burden of proving that the funds are exempt from garnishment based on D.C. law concerning tenancy by the entireties. <u>Id.</u> at 11–12. Regardless of whether WDG waived its tenancy by the entireties argument, as explained above, the Court concludes that D.C. law concerning tenancy by the entireties does not protect WDG's corporate assets, and that WDG lacks third-party standing to invoke this right on Barbara Monts's behalf.

The alter ego doctrine is typically used to cast aside the corporate shield and hold a shareholder or other dominant figure personally responsible for the liabilities of the corporation. See Labadie Coal Co. v. Black, 672 F.2d 92, 96 (D.C. Cir. 1982) ("[W]hen particular circumstances merit . . . courts may look past a corporation's formal existence to hold shareholders or other controlling individuals liable for 'corporate' obligations."). Hence, in appropriate circumstances "the fiction of a separate corporate personality is 'pierced' to reach the individual behind the corporation." United States v. Emor, 850 F. Supp. 2d 176, 206 (D.D.C. 2012); Camacho v. 1440 Rhode Island Ave. Corp., 620 A.2d 242, 249 (D.C. 1993) ("[I]t must appear that . . . the separateness of the [dominant figure] and the corporation has ceased and . . . an adherence to the fiction of the separate existence of the corporation would . . . promote injustice." (internal quotation marks omitted)). Under a reverse veil-piercing theory, the traditional veil-piercing doctrine is applied in reverse, such that a corporation's assets are held accountable for the liabilities of an individual who treated the corporation as his or her alter ego.[7] See Emor, 850 F. Supp. 2d at 206; see also IBF Corp. v. Alpern, 487 A.2d 593, 596 n.8 (D.C. 1985) (affirming that "reverse veil-piercing" is authorized by D.C. Code § 16–579); Pac. Dev., Inc. v. United States, No. 77-0690, 1979 WL 1283, at *2 (D.D.C. Jan. 3, 1979), aff'd sub nom. Valley Fin., Inc. v. United States, 629 F.2d 162 (D.C. Cir. 1980) (affirming reverse veil-piercing to permit the government to seize corporate assets to satisfy dominant shareholder's tax debt); 1 Fletcher, Cyclopedia of the Law of Corporations § 41.70 (rev. ed. 2016).

---

[7] The reverse veil-piercing doctrine commonly is used by the federal government to seize corporate assets to satisfy delinquent tax obligations of a dominant shareholder. See, e.g., Emor, 850 F. Supp. 2d at 206; Towe Antique Ford Found. v. IRS, 999 F.2d 1387, 1390 (9th Cir. 1993) (collecting cases).

Generally, the law of the state where the corporation is incorporated—here, the District—dictates whether the corporate veil should be pierced.[8]  See United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc., 191 F. Supp. 2d 17, 20 (D.D.C. 2002).  Under D.C. law, the party seeking to pierce the corporate veil must show that there is: "(1) unity of ownership and interest, and (2) [either] use of the corporate form to perpetrate fraud or wrong, or other considerations of justice and equity justify it."  Estate of Raleigh v. Mitchell, 947 A.2d 464, 470 (D.C. 2008) (internal quotation marks omitted) (quoting Bingham v. Goldberg, Marchesano, Kohlman, Inc., 637 A.2d 81, 93 (D.C. 1994)).  Stated differently, the test is: "'(1) have the shareholder and the corporation failed to maintain separate identities? and (2) would adherence to the corporate structure sanction a fraud, promote injustice, or lead to an evasion of legal obligations?'"  Emor, 850 F. Supp. 2d at 206 (quoting Bufco Corp. v. NLRB, 147 F.3d 964, 969 (D.C. Cir. 1998)).  "The ultimate principle [in a veil-piercing analysis] is one permitting its use to avoid injustice."  Estate of Raleigh, 947 A.2d at 471 (internal quotation marks omitted) (quoting United States v. Andrews, 146 F.3d 933, 940 (D.C. Cir. 1998)).  Because it is an equitable doctrine, "the decision to pierce will be influenced by considerations of who should bear the risk of loss and what degree of legitimacy exists for those claiming the limited liability protection of a corporation."  Vuitch v. Furr, 482 A.2d 811, 816 (D.C. 1984); see also Labadie Coal Co., 672 F.2d at 96 (veil-piercing is appropriate "when the incentive value of limited liability is outweighed by the competing value of basic fairness to parties dealing with the corporation").  For the reasons explained below, the Court finds that the government has established both elements required to pierce WDG's corporate veil.

---

[8] Federal common law, rather than state law, governing the veil-piercing question applies in cases where some federal interest is implicated by the decision whether to pierce the corporate veil.  See U.S. Through Small Bus. Admin. v. Pena, 731 F.2d 8, 12 (D.C. Cir. 1984).  The distinction is immaterial here, however, because "the standards for veil-piercing under federal and District of Columbia law are 'substantively identical.'"  Emor, 850 F. Supp. 2d at 205 n.10 (quoting TAC–Critical Sys., Inc. v. Integrated Facility Sys., Inc., 808 F. Supp. 2d 60, 65 (D.D.C. 2011)).

WDG makes two incorrect arguments about the standard that should be applied. First, WDG argues that the government needs to show actual fraud perpetrated through use of the corporate form. See Interv'r's 2d Opp'n at 7–8, 16. But that is not so. See TAC-Critical Sys., Inc., 808 F. Supp. 2d at 66 (D.C. veil-piercing standard "requires neither allegations nor proof of fraud"); McWilliams Ballard, Inc. v. Broadway Mgmt. Co., 636 F. Supp. 2d 1, 8 (D.D.C. 2009) (same); Bingham, 637 A.2d at 93 (rejecting the requirement that fraud must be shown; "[i]nstead, considerations of justice and equity may justify piercing the corporate veil").

Second, WDG misreads U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25 (D.D.C. 2007), for the proposition that the corporation whose veil is to be pierced must have participated in the wrongful conduct itself. See Interv'r's 2d Opp'n at 18. The government correctly points out that in Hockett the court was looking at two different avenues available to a relator attempting to prove a parent corporation's liability for false claims made by a subsidiary—either (1) by direct participation in the fraudulent claims or (2) through veil-piercing. 498 F Supp. 2d at 59–63. Here, the government's argument is that WDG was Monts's alter ego, not that WDG participated in the FCA violations or that WDG was TDC's alter ego.

### A. Unity of Interest Between WDG and T. Conrad Monts

To determine whether there is a sufficient unity of interest to warrant piercing the corporate veil, courts consider various factors, including (1) whether a single shareholder dominates the corporation, (2) whether corporate formalities have been disregarded, (3) whether the corporation has maintained minutes or adequate corporate records, (4) whether corporate funds and assets have been extensively intermingled with personal assets, and (5) fraudulent use of the corporation to protect personal business from the claims of creditors. Estate of Raleigh, 947 A.2d at 470–71; United States v. Dynamic Visions, Inc., 220 F. Supp. 3d 16, 24–26 (D.D.C. 2016); Lopes v.

<u>JetsetDC, LLC</u>, 994 F. Supp. 2d 135, 147 (D.D.C. 2014). No single factor predominates and "[i]t is clearly not necessary that all of these factors be present in a given case to justify piercing the veil." <u>Labadie Coal Co.</u>, 672 F.2d at 97. The veil-piercing test "is a practical one, based largely on a reading of the particular factual circumstances." <u>Valley Fin., Inc.</u>, 629 F.2d at 172. "As a fact issue, its ultimate determination is dependent upon the sound discretion of the trial judge in his appraisal of the evidence." <u>Id.</u> Here, the factors that predominate are WDG's consistent disregard for corporate formalities, Monts's domination and control of WDG's affairs, and the extensive commingling of funds between WDG and Monts's affiliated companies.

The disregard for corporate formalities strongly supports piercing the corporate veil. <u>See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Sorac, Inc.</u>, No. Civ. A. No. 90-0606(RCL), 1991 WL 637106, at *1 (D.D.C. May 16, 1991) ("[T]he degree to which an individual purporting to be protected by the corporate veil has adhered to corporate formalities 'provides an excellent litmus of the extent to which the individuals involved actually view the corporation as a separate being.'" (emphasis omitted) (quoting <u>Labadie Coal Co.</u>, 672 F.2d at 97)). WDG's board of directors met infrequently and provided little oversight of Monts's control of WDG's affairs. It is undisputed that WDG's board met only seven times and held just two calls in the 24 years of its existence.[9] Hersh Decl. at 10. This is a mere fraction of the meetings that should have occurred had WDG's board followed standard corporate practice and met at least annually.[10] WDG's board did not compensate for its infrequent meetings by acting through board resolutions: the record shows that there were only three of those. <u>Id.</u> The documents before the Court confirm that when the board

---

[9] Oddly, WDG argues that "[c]ontrary to the Government's assertion, WDG did maintain Board of Director Meetings." Rogers Decl. ¶ 46. But the government does not assert that there were no meetings, rather that there were only seven meetings in 24 years. Suppl. Hersh Decl. [ECF No. 265-1] at 5. That, WDG does not dispute.

[10] As the government points out, the minutes of WDG's board meetings that did take place evidence the requirement that WDG's board was supposed to meet annually. Gov't's 2d Reply at 19.

did meet, Monts chaired and controlled the meetings. See, e.g., Ex. 6 to Rogers Decl. [ECF No. 261-9] at 9–10, 18, 19, 23. Board meetings generally appear to have been short and lacking in discussion of overall corporate policy. See id.; Hersh Decl. at 10–11. In Valley Finance, Inc., the Court found the conclusion that "board members neither controlled nor influenced corporate affairs [was] amply supported" when the record showed that the board met infrequently, meetings were short, and the board approved corporate decisions and policies without discussion or question. 629 F.2d at 172; see also Emor, 850 F. Supp. 2d at 207–208 (finding corporation was alter ego of dominant shareholder in part because board was "particularly nominal," did not meet annually, and no evidence "was brought to the Court's attention in which anyone from [the corporation] or its Board said no to one of [the dominant shareholder's] proposals or questioned his use of . . . funds"). The Court draws the same conclusion here.

WDG's disregard for corporate formalities was not limited to the boardroom. The corporate records show a similar dearth of shareholder meetings (only five shareholder meetings in 24 years), notwithstanding that WDG's by-laws required that shareholder meetings be held at least annually. Hersh Decl. at 10. WDG also disregarded its corporate filing requirements, twice having its Certificate of Incorporation revoked by the District based on WDG's failure to file required annual reports for two consecutive years. Hersh Decl. at 10; Ex. 6 to Rogers Decl. at 20–21. Additionally, although Barbara Monts paid consideration for her shares by forgiving a $30,000 loan that she made to WDG, there is no evidence that WDG conducted a formal appraisal to ensure that this was sufficient consideration based on the value of the shares. Rogers Decl. ¶ 45; Hersh Decl. at 9. All in all, Monts's lack of adherence to corporate formalities as president of WDG shows that he did not view the corporation as separate and distinct from himself.

Unity of interest and ownership can also be demonstrated "by showing domination and control of a corporation." Vuitch, 482 A.2d at 816. Here, it is undisputed that Monts was the president, a director,[11] and the sole shareholder (as tenants by the entireties with his wife) of WDG. Hersh Decl. at 4–5; Rogers Decl. ¶¶ 43–44. As a result, Monts controlled the reins of the corporation and its assets. See TDC Mgmt. Corp., 827 F.3d at 1134 (concluding that the record supported the finding that Monts was "able to compel WDG to distribute corporate assets to himself and other corporations that he owned" (internal quotation marks omitted)). The government contends and WDG does not dispute that "Monts's signature on numerous corporate documents, his presiding over corporate affairs, and his actions on behalf of WDG is pervasive in the corporate documents." Hersh Decl. at 9. When WDG's board convened (which was rarely, as explained above), Monts chaired and controlled the meetings. Most critically, the Court has not seen any evidence that anyone other than Monts made a significant corporate decision for WDG prior to his death. See Valley Fin., Inc., 629 F.2d at 172 (piercing the corporate veil where there was "no evidence that a major corporate decision was ever made by anyone other than [the dominant owner]"). Barbara Monts, on the other hand, appears to have been an owner of WDG on paper only. WDG does not dispute that between January 1, 1991—the date when Barbara Monts received shares in WDG—and the time of her husband's death, Barbara Monts is mentioned only twice in the corporate documents. Hersh Decl. at 9. Neither reference shows her exercising any significant discretionary authority. Id. Upon consideration of the entire record then, the Court concludes that the facts establish that T. Conrad Monts dominated WDG's affairs such that "the

[11] WDG acts as though it is significant that Monts was not an original director of the corporation. Interv'r's 2d Opp'n at 14. But on September 15, 1988—just a few months after WDG was incorporated—Monts, acting as the only corporate shareholder, elected himself, Eugene A. Darrell, and Windsor Monts (who is presumably a relative) to replace the original Board of Directors. Ex. 6 to Rogers Decl. at 2.

separateness of [Monts] and the corporation [had] ceased." Camacho, 620 A.2d at 249; U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc., 608 F.3d 871, 897 (D.C. Cir. 2010) (similar).

The financial dealings between WDG, Monts, and his other affiliated companies provides further evidence that Monts viewed WDG as a business conduit to benefit himself, rather than as an independent corporate entity. See Dynamic Visions, Inc., 220 F. Supp. 3d at 24–26 (piercing the corporate veil because the sole owner and president withdrew large sums of money from the corporation's bank accounts and moved them to his personal accounts, or to the accounts of his two other businesses that had no substantive connection to the corporation). For instance, between 1988 and 2003, WDG borrowed nearly $1 million from Monts's other companies. Yet the government asserts, and WDG does not dispute, that there is no evidence that these loans were authorized by corporate action; had promissory notes; were secured by collateral; or that WDG paid any interest on them. Hersh Decl. at 6; see also N. Tankers (Cyprus) Ltd. v. Backstrom, 967 F. Supp. 1391, 1405–06 (D. Conn. 1997) (finding evidence of intercompany loans that were not memorialized by promissory notes and where no interest was paid supported decision to pierce the corporate veil). Because these loans lacked proper documentation, their business purpose is unclear; however, it appears that WDG received at least some of these loans from companies that had no apparent business relationship with WDG, beyond their common ownership by Monts. See Gov't's 2d Reply at 18 n.11. Rather than repay these loans, WDG (through Monts) decided that it would not repay and wrote off almost $730,000 in debt owed to affiliated companies, including TDC Management Corporation.[12] Hersh Decl. at 5–6; Rogers Decl. ¶ 49. In other words, by not

---

[12] The government alleges and WDG does not dispute that WDG wrote off a $199,754 loan owed to TDC, depleting TDC's cash reserves. Hersh Decl. at 6. WDG merely points out that WDG also decided to not repay loans due to other companies besides TDC. Interv'r's 2d Opp'n at 15; Rogers Decl. ¶ 51. Similarly, the government alleges that another of Monts's companies, Travenca Development Corporation, owed TDC approximately $375,000, which was "either cancelled without payment [or] was distributed by TDC to Monts and his wife." Suppl. Hersh Decl. at 3.

repaying these loans Monts effectively transferred money from TDC to WDG at no cost to WDG. The lack of formality, lack of interest payments, and unilateral decision not to repay these loans shows that Monts did not treat these companies as separate corporations dealing at arm's length, but rather as a single incorporated pocketbook allowing him to divert funds for his own personal benefit. See Valley Fin., Inc., 629 F.2d at 172 (finding president and sole shareholder manipulated corporation for his own financial benefit when he assigned profits from work performed by corporation to himself or his other companies and he assigned funds to corporation for ventures in which the corporation played no part); cf. Shapiro, Lifschitz & Schram, P.C. v. Hazard, 90 F. Supp. 2d 15, 23–25 (D.D.C. 2000) (piercing the corporate veil between two corporations based on one corporation's "oral, unsecured, interest-free loans" to the other which did not benefit the lending corporation in any obvious way; finding the corporations "did not maintain an arms-length relationship in their transactions" and this activity "essentially amounted to a commingling of funds").

Beginning in 2004, tax records show that WDG reclassified loans "[d]ue to [a]ffiliates" as "[l]oans from [s]hareholder." Hersh Decl. at 7, 12 (between 2004 and 2009, WDG's tax returns reported $439,665 borrowed from its "shareholder"). Thus, these were loans to WDG from Monts (or his wife). But again, formalities were lacking and WDG did not deal at arms-length with its "shareholder." Id. (finding no evidence of any corporate authorization, promissory notes, collateral, or interest payments for these personal loans to WDG). This essentially amounted to a commingling of Monts's personal and WDG's corporate funds and supports the Court's conclusion that WDG's corporate form should be disregarded.

---

Travenca is a company that appears unrelated to TDC's stated business purposes. Gov't's 2d Reply at 15–16; Suppl. Hersh Decl. at 1–2.

WDG argues instead that its corporate form should be respected because WDG: "retained a Board that included independent directors," "had a legitimate business purpose" unrelated to TDC or the False Claims Act case, and "maintained separate books and records." Interv'r's 2d Opp'n at 14–16. These arguments are unavailing. The board rarely met and there is no evidence that the independent directors served as a check on Monts's authority. Although WDG may theoretically have had a legitimate purpose, that does not mean that Monts's actions on behalf of WDG aligned with that business purpose. And WDG's use of separate books and records did not prevent Monts from effectively commingling WDG's funds with his other corporations through undocumented, unsecured, interest free loans. The Court also rejects WDG's position that veil-piercing is inappropriate because the way in which Monts ran his businesses was "not atypical or unusual for a series of related entities [in the real estate business]." Rogers Decl. ¶ 9. An individual cannot justify his disregard for corporate formalities simply by arguing that his practices comport with the industry norm. See I.A.M. Nat. Pension Fund v. Wakefield Indus., Inc., No. Civ. A. No. 82-2187, 1991 WL 511071, at *5 (D.D.C. Oct. 18, 1991) (rejecting claim that corporate formalities can be ignored because "this is the 'reality of how closely-held corporations operate.'"). Hence, an individual cannot disregard "the formal existence of a corporation in his daily business, and then use the same formal framework to shelter himself from liability." Id.

In sum, the Court finds that the current undisputed record demonstrates a sufficient degree of unity between Monts and WDG to warrant reverse piercing of the corporate veil.

**B. An Inequitable Result Would Follow If The Court Did Not Pierce WDG's Corporate Veil**

If the Court did not pierce the corporate veil in this case, a highly inequitable result would follow. In 2000—the year that the government obtained the judgment against Monts and TDC—TDC had nearly $800,000 in total assets. Rogers Decl. ¶ 16. Thereafter, between 2001 and 2003,

TDC substantially reduced its assets through a series of loan repayments to Monts's affiliated companies (totalling approximately $322,000) and by paying officer compensation directly to Monts. Interv'r's 2d Opp'n at 11–12; Rogers Decl. ¶¶ 18–19. The government contends that these payments were designed to dissipate TDC's assets to avoid payment of the judgment; WDG retorts that "[t]his was a simple repayment of existing loans and it was not any dissipation of assets." Rogers Decl. ¶ 18. But there is no evidence of promissory notes or payment schedules establishing that these loans came due. Notably, in other circumstances Monts chose to cancel rather than repay loans between his affiliated companies. But he did not do so for TDC. It is undeniable that these repayments reduced the assets TDC had available to satisfy the judgment. Moreover, at the same time TDC was reducing its assets via loan repayments, Monts (through WDG) decided not to repay a nearly $200,000 loan owed to TDC. Hersh Decl. at 6. The government contends that even after TDC's loan repayments to affiliates, and forgiveness of loans due to TDC (e.g., by WDG), TDC maintained nearly $300,000 in equity, but that amount was paid directly to T. Conrad and Barbara Monts. Suppl. Hersh Decl. at 2–3. The Court finds that it is fair to infer from the record that Monts was acting to keep funds out of TDC after the judgment in this case. See I.A.M. Nat. Pension Fund, 1991 WL 511071, at *5 (finding "selective diversion of corporate assets as a relevant factor in the first prong of the veil-piercing analysis").

Now, sixteen years later, TDC is defunct and WDG's settlement funds appear to be the only funds available to satisfy the judgment. If the Court were now to decline to pierce the corporate veil, the government might never be able to collect the judgment, and Monts would be rewarded for what appears to be an effort to frustrate collection of the judgment. See Valley Fin., Inc., 629 F.2d at 171–72 ("The Government's inability otherwise to satisfy legitimate tax debts clearly may form a sound basis for such disregard of corporate form."); Dynamic Visions, Inc.,

220 F. Supp. 3d at 26 (finding inequity would result when sole owner of corporation withdrew and transferred corporate funds and, without piercing, government would not have been able to reach funds to satisfy FCA judgment); Sorac, Inc., 1991 WL 637106, at *5 (finding that inequity would result due to the defendant placing the corporation in a position in which the plaintiff would be unable to recover funds if judgment was entered in the plaintiff's favor). Here, it is clear that "equity requires the action to assist a third party." Estate of Raleigh, 947 A.2d at 471. Accordingly, the Court will pierce the corporate veil and hold WDG liable for Monts's conduct.

## III.    THIRD-PARTY STANDING

The D.C. Circuit also directed this Court to consider whether, if the Court pierces the corporate veil, WDG has third-party standing to argue that the settlement funds may not be garnished because WDG was owned by Monts and his wife as tenants by the entireties. The Court concludes that WDG cannot satisfy the requirements for third-party standing.

The doctrine of third-party standing is a prudential limitation on the ability of third parties to challenge actions that injure others who are not before the court. Lepelletier v. FDIC, 164 F.3d 37, 43 (D.C. Cir. 1999). Ordinarily, "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." Powers v. Ohio, 499 U.S. 400, 410 (1991); see also Deutsche Bank Nat. Trust Co. v. FDIC, 717 F.3d 189, 194 (D.C. Cir. 2013); Steffan v. Perry, 41 F.3d 677, 697 (D.C. Cir. 1994) (en banc); United States v. Nicolo, 597 F. Supp. 2d 342, 353 (W.D.N.Y. 2009) ("[Defendant's] arguments in this regard, however, are both premature and not his to make, since a defendant does not have standing to object to forfeiture on the grounds that a third party owns the property." (internal quotation marks omitted)). Because third-party standing is the "exception rather than the norm," the burden is on the party attempting to assert third-party rights to establish that he has third-party standing. Al-

Aulaqi v. Obama, 727 F. Supp. 2d 1, 23 (D.D.C. 2010); see also Amato v. Wilentz, 952 F.2d 742, 750 (3d Cir. 1991).

WDG argues that "[e]ven if this Court were to pierce the corporate veil and hold that Mr. Monts had a direct ownership interest in WDG's assets," the FDCPA would still prevent the government from garnishing that interest "because Mr. Monts co-held that interest with Mrs. Monts and the government does not purport to be a creditor of hers."[13] Interv'r's Mot. for Order at 2. In making this argument, WDG is attempting to assert a legal right that belongs to Barbara Monts, not to WDG.[14] See In re Wall's Estate, 440 F.2d 215, 218 (D.C. Cir. 1971) (explaining that tenancy by the entireties is a form of ownership belonging to marital partners that is designed to safeguard marital property); Coleman v. Jackson, 286 F.2d 98, 99 (D.C. Cir. 1960) (stating that "tenancy [by the entireties] can exist only between husband and wife"); Clark v. Clark, 644 A.2d 449, 452 (D.C. 1994) (noting that tenancy by the entireties is designed to protect "a marital asset"); see also TDC Mgmt. Corp., 827 F.3d at 1133 (recognizing that certain claims "assert the company's own rights" while others may not). WDG is not a party to the legally protected relationship (i.e., marriage), nor is it the intended beneficiary of the joint tenancy. And Barbara Monts, it is agreed, has never herself attempted to participate in this case, or to substitute for T. Conrad Monts. The Court finds that WDG lacks third-party standing to assert her rights.

---

[13] Notably, WDG argues that together, the FDCPA and Morrison v. Potter "compel the conclusion that the government cannot garnish Mrs. Monts' interest in WDG." Interv'r's Mot. for Order at 7. But unlike this case, where WDG is attempting to assert Barbara Monts's right to property, in Morrison a wife asserted her own right to property held in a joint bank account with her husband as a tenancy by the entireties. 764 A.2d at 235.

[14] The Court therefore rejects WDG's argument that "[t]he third-party standing doctrine does not apply here because WDG is attempting to vindicate its own pecuniary interest." Interv'r's Mot. for Order at 10. Whether WDG has a pecuniary interest sufficient to satisfy Article III standing is distinct from whether WDG has third-party standing to assert Barbara Monts's legal rights. Moreover, Article III standing is a necessary element, but not sufficient on its own, to establish third-party standing. See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. FDIC, No. 14-CV-953 (GK), 2016 WL 7376847, at *12 (D.D.C. Dec. 19, 2016) ("A party seeking to clear the prudential hurdle of third-party standing must first establish that it has Article III standing."); see also Sands v. NLRB, 825 F.3d 778, 784 (D.C. Cir. 2016) (noting that "[plaintiff] must show that he has standing under Article III, and that he satisfies third-party, or jus tertii, standing requirements" (emphasis original)).

The Supreme Court has recognized that litigants may assert the rights of third parties provided that three important criteria are satisfied: (1) the litigant must demonstrate an injury in fact, "thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute"; (2) the litigant must demonstrate "a close relation to the third-party"; and (3) "there must exist some hindrance to the third-party's ability to protect his or her own interests." Lepelletier, 164 F.3d at 43 (internal quotation marks omitted) (quoting Powers, 499 U.S. at 411).

Even assuming that WDG has established the injury in fact element, it has failed to argue, let alone establish, that the other required elements are satisfied.[15] WDG cannot show that Barbara Monts is faced with any hindrance to asserting her own legal rights in this case. A hindrance requires a "genuine obstacle" preventing the third-party from asserting her legal rights. Al-Aulaqi, 727 F. Supp. 2d at 30. The Supreme Court has recognized the following as sufficient hindrances justifying third-party standing: (1) deterrence from filing suit due to privacy concerns, (2) systemic practical challenges to pursuing one's own rights, or (3) the "imminent mootness" of a case. See Singleton v. Wulff, 428 U.S. 106, 117 (1976); see also e.g., Powers, 499 U.S. at 414. It is clear, however, that merely declining to assert a claim does not amount to a hindrance. See Miller v. Albright, 523 U.S. 420, 450 (1998) (O'Connor, J., concurring) ("A hindrance signals that the rightholder did not simply decline to bring the claim on his own behalf, but could not in fact do so."); Al-Aulaqi, 727 F. Supp. 2d at 32 (concluding that father lacked third-party standing to assert claims on behalf of his son because son "could have brought suit on his own behalf, but . . . simply

---

[15] Neither party mentions the D.C. Circuit's decision in Haitian Refugee Ctr. v. Gracey—which pre-dated Powers—where the court held that "third party standing . . . is appropriate only when the third party's rights protect that party's relationship with the litigant." 809 F.2d 794, 809 (D.C. Cir. 1987); see also Am. Immigration Lawyers Ass'n v. Reno, 199 F.3d 1352, 1362 (D.C. Cir. 2000) (recognizing the possibility that the Powers and Haitian Refugee tests "now coexist and a party can establish third party standing by meeting either standard"). But WDG does not have third-party standing under that standard either because the right of tenancy by the entireties is not a substantive protection of the corporation-shareholder relationship; rather it is a substantive protection for the marital relationship.

declined to do so"); see also Hughes v. City of Cedar Rapids, 840 F.3d 987, 992 (8th Cir. 2016) (finding husband lacked third-party standing to sue on his wife's behalf because wife received notice of traffic violation but chose not to assert her rights to challenge that violation). Barbara Monts is undoubtedly aware of these proceedings (as a shareholder of both TDC and WDG), yet she has never filed an objection to the garnishment or otherwise intervened to assert her own rights to the settlement funds. She could have done so, but she chose not to.[16] The Court cannot "subvert the purpose of the Powers prudential standing requirements by 'adjudicat[ing] . . . rights unnecessarily' when 'the holders of those rights . . . do not wish to assert them.'" Al-Aulaqi, 727 F. Supp. 2d at 33 (quoting Singleton, 428 U.S. at 114).

Similarly, WDG failed to argue (and in any event cannot show) that it has a close relation to Barbara Monts because their interests are not aligned. See id. at 32–33 (explaining that alignment requires "identity of interests"); see also Aid for Women v. Foulston, 441 F.3d 1101, 1113 (10th Cir. 2006) (finding interests of the third party plaintiff and potential plaintiff sufficiently aligned such that the third-party "can provide proper representation of those rights"). As the D.C. Circuit pointed out, "[T. Conrad] Monts has no interest in any specific corporate asset because the corporation may use any asset to satisfy creditors or engage in other business rather than distribute that asset as a dividend or upon liquidation." TDC Mgmt. Corp., 827 F.3d at 1131. The same is true of Barbara Monts.

Accordingly, WDG cannot satisfy third-party standing requirements and the Court finds that D.C. law on tenancy by the entireties does not prevent the government from garnishing the settlement funds to satisfy the judgment in this case.[17]

---

[16] Nor has she, or anyone else, been properly substituted for T. Conrad Monts.

[17] The government also argues that the judgment is a joint debt of T. Conrad and Barbara Monts because TDC was co-owned by Monts and his wife. The government accordingly argues that any property jointly owned by Monts and his wife (e.g., WDG) may be garnished by the United States. Gov't's Opp'n to Interv'r's Mot. for Order

## CONCLUSION

For the reasons set forth above, the Court will grant the government's motion for a disposition order directing the garnishee to pay the United States, and will deny WDG's motion for a disposition order. A separate Order has been issued on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: July 13, 2017

---

at 13–14. WDG responds that this argument is both untimely and baseless. Interv'r's Reply to Gov't's Opp'n at 6–8. Because the funds in question are subject to garnishment under the government's veil-piercing theory, the Court need not reach this alternative theory.